UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JOHN WEEKS,

                    Plaintiff,

          - against -

SUFFOLK COUNTY POLICE DEPARTMENT,
COUNTY OF SUFFOLK, JOHN GALLAGHER,
Suffolk County Police Commissioner, PHILLIP
ROBILOTTO, Chief of Department, Suffolk
County Police Department, PETER J. QUINN,
Inspector, Suffolk County Police Department,
DENNIS MEEHAN, Deputy Inspector, Suffolk
County Police Department, PAUL RYAN, Captain,
Suffolk County Police Department, WILLIAM REEDE,
Captain, Suffolk County Police Department, ROBERT
DONAHUE, Sergeant, Suffolk County
Police Department, JAMES EDMONDS, Police
Officer, Suffolk County Police Department,
MICHAEL EDGLEY, Police Officer, Suffolk
County Police Department,

                    Defendants.
-------------------------------------------------------------X

**COMPLAINT**

Jury Trial Demanded

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   AUG 2 9 2003   ★

LONG ISLAND OFFICE

CV 03 4294

WEXLER, J.

LINDSAY, M.

          Plaintiff, by and through his attorneys, Leeds Morelli & Brown, P.C., complaining of the

Defendants, alleges upon knowledge as to himself and his own actions and upon information and

belief as to all other matters as follows:

                    **JURISDICTION AND VENUE**

          1.          This is a civil action seeking monetary damages and affirmative relief based upon the

defendant's violations of 42 U.S.C. §§ 1983, 1985 and 1986, as well as the New York Human Rights

Law, Section 290 et seq. of the Executive Law of New York.

2.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1331, 1343(3) and (4), 1367 and 2201, and Section 290 et seq. of the Executive Law of the State of New York. The pendent jurisdiction of this Court (28 U.S.C. 1367) is invoked over state law and municipal causes of action arising under the New York State Law.

3.      Venue is proper pursuant to 28 U.S.C. 1391.

## PARTIES

4.      Plaintiff, at all times hereinafter mentioned, is an individual who was, and still is, a resident of the County of Suffolk.

5.      Defendant, Suffolk County Police Department ("SCPD"), at all times hereinafter mentioned, was and still is an agency of the State of New York and is a  public employer with a principal place of business at 30 Yaphank Avenue, Yaphank,  New York.

6.      Defendant, County of Suffolk ("Suffolk"), at all times hereinafter mentioned, was and still is a municipal corporation of the State of New York, with its principal place of business at 888 Veterans Memorial Highway, Hauppauge, New York.

7.      Upon information and belief, defendant John Gallagher ("Gallagher") was and still is, at all relevant times, an individual who is employed by the SCPD as Police Commissioner.

2

8.    Upon information and belief, defendant Phillip Robilotto ("Robilotto") was and still is, at all relevant times, an individual who is employed by the SCPD as the Chief of the Department.

9.    Upon information and belief, Peter J. Quinn ("Quinn") was and still is, at all relevant times, an individual employed by the SCPD as an Inspector.

10.    Upon information and belief, Dennis Meehan ("Meehan")  was and still is, at all relevant times, an individual employed by the SCPD as a Deputy Inspector.

11.    Upon information and belief, Paul Ryan ("Ryan") was and still is, at all relevant times, an individual employed by the SCPD as a Captain.

12.    Upon information and belief, William Reede ("Reede") was and still is, at all relevant times, an individual employed by the SCPD as a Captain.

13.    Upon information and belief, Robert Donahue ("Donahue") was and still is, at all relevant times, an individual employed by the SCPD as a Sergeant.

14.    Upon information and belief, James Edmonds ("Edmonds") was and still is, at all relevant times, an individual employed by the SCPD as a Police Officer.

3

15.     Upon information and belief, Michael Edgley ("Edgley") was and still is, at all relevant times, an individual employed by the SCPD as a Police Officer.


**BACKGROUND FACTS**

16.     Plaintiff is a bisexual male[1] employed as a police officer with SCPD, who was perceived by the defendants as gay.


17.     Plaintiff began employment with the SCPD on February 13, 1989.  He was initially assigned to the 3rd Precinct until December 1993 when he was assigned to the Highway Patrol.


18.     While in the 3rd Precinct, plaintiff was warned by his squad supervisor that there was "no place in the 3rd Precinct for gay officers."


19.     In November 1999, the SCPD ordered plaintiff to relinquish his weapons based upon an unfounded and unsubstantiated complaint that plaintiff was gay and mentally unstable.


20.     Plaintiff was warned by his PBA representatives to deny to all police department supervisors anything about being gay or bisexual, even if he was gay or bisexual.  Plaintiff was also warned that Chief Robilotto would do anything possible to get rid of him if plaintiff was found to be gay or bisexual.

---

[1]Depending on the definition used, plaintiff is bisexual and/or gay.

21.     On December 16, 1999, Internal Affairs Bureau ("IAB") officers, Sgt. John Fay and Lt. Kevin Brennan, visited plaintiff's home and searched plaintiff's computer. During the course of the search, Sgt. Fay stated that the computer's internet history file showed that a gay website was visited.

22.     The next day IAB Sgt. John Fay, Lt. Kevin Brennan, and Captain William Reede returned to plaintiff's home and treated plaintiff with disrespect while demanding to search his home. Plaintiff would not consent to the search, but IAB loitered around his property.

23.     IAB officers returned that day, again rudely attempting to obtain access to plaintiff's home. Eventually, plaintiff was convinced to sign a consent form allowing IAB to search only the computer room. Upon said search, the officers observed that adult gay websites had been visited. The officers all seemed disgusted by the sites.

24.     The officers then illegally searched the entire house, without consent. During the search, the hard drives were removed from plaintiff's operational computer as well as two other computers. A tape drive, ZIP drive, and all data media were also removed.

25.     Upon information and belief, the fact that plaintiff was confirmed gay was disseminated throughout plaintiff's precinct. This was obvious because, shortly after these events, plaintiff was subjected to severe and pervasive harassment based on his sexual orientation.

26.    The harassment included, but was not limited to, numerous severe, offensive and unwelcome oral comments and writings/depictions reciting derogatory comments about plaintiff's sexual orientation and/or generally offensive comments about gay persons and/or homosexuality.

27.    The harassment was perpetrated by plaintiff's co-workers and supervisors. Supervisors who did not participate in the harassment were aware of it, but unreasonably failed to prevent same.

28.    On February 16, 2000, a department directive was issued announcing plaintiff's transfer to the 3rd precinct. After the directive was posted, sexually harassing writings were placed on the walls of various commands.

29.    On February 18, 2000, plaintiff was transferred to the 3rd Precinct.

30.    Because he previously had his weapons removed, he was not in possession of weapons and he therefore could not be assigned to full duty; he was assigned to restricted desk duty.

31.    When plaintiff began work at the 3rd precinct, he observed offensive anti-gay signs and notes that were placed on the walls and blackboards in the 3rd Precinct. For example, "Gay PO Weeks." Many of the signs appeared to be death threats. Supervisors allowed anti-gay statements to be written on two chalkboards within the precinct, among other locations.

6

32.    Also, upon plaintiff's transfer to the 3rd Precinct desk, P.O Edgley, P.O. Edmonds and other police officers  made offensive comments about plaintiff's sexual orientation.  Plaintiff complained to Sgt. Robert Donahue about the comments, but Sgt. Donohue laughed rather than take any measures to stop the harassment.

33.    On February 21, 2000, plaintiff complained to Chief Robilotto about the aforementioned harassment.  Again, the situation was not remedied.

34.    That same day, a department directive was issued claiming that plaintiff had pled guilty to "conduct unbecoming an officer," that he had forfeited 100 days of accrued time, and that he was on disciplinary probation for 10 years.

35.    In the interim, plaintiff had continued unsuccessfully to have his weapons returned and be returned to full duty.  The weapons were not returned, nor was plaintiff returned to full duty, despite the fact that multiple mental health care professionals reported to the SCPD that plaintiff was mentally stable.

36.    Throughout his employment subsequent to his being outed, Plaintiff was continually verbally abused by co-workers and supervisors.  For example, on June 15, 2000, plaintiff received numerous crank calls from police personnel while working at the desk.  During these calls the callers made obscene, anti-gay remarks, such as "Die homo," "suck my dick fag," and, "I hear gay cops give good head."

7

37.     Plaintiff complained about these calls to Sgt Donohue and others, yet no steps were taken to remedy the situation.

38.     On July 19, 2000, plaintiff's weapons were finally returned.  He then requested that he be returned to work in a patrol car, rather than desk duty.  This request was denied and plaintiff was told that the reason was because Chief Robilotto wanted him punished.

39.     On August 2, 2000, plaintiff was finally permitted to return to patrol.  When he called on-duty as required, he was told by P.O. Edgley not to search "any guy's cocks."  Plaintiff heard other police personnel in the background laughing in response to the offensive comment.

40.     On August 3, 2000,  P.O. Edgley told plaintiff that "gay cops don't get assigned to cars ... Besides, you should put in for a double car with a cute guy like [James] Cullen. He has a big ass for you to fuck."

41.     On August 4, 2000, plaintiff attempted to obtain a transfer.  This request was denied.

42.     On September 1, 2000, plaintiff attempted to meet with Chief Robilotto.  Plaintiff was denied access to the Chief and was informed that he could not have any contact with the Chief or the Chief's staff from that point forward.

43.     On September 29, 2000, plaintiff was forced to work the desk.  On numerous occasions when plaintiff answered the telephone, persons on the other end made obscene comments including  "suck my cock, Weeks."  Officers were apparently taking turns making these calls.  Plaintiff asked other officers to answer the phone for him and they refused.  Plaintiff complained to Sgt. Donohue and others numerous times about the abuse and asked both to remove him from the desk assignment. All requests were denied and plaintiff's supervisors told him to "get over it," and "make friends not enemies."

44.     On January 30, 2001, plaintiff was ordered to sign an attendance sheet for the year 2000 that he disagreed with.  He signed it under order and wrote in the signature box "due to coercion/discrimination, I refuse to sign, but signed as ordered by Lt. Burke."

45.     On February 6, 2001, plaintiff saw writing on the precinct wall stating "Weeks takes it up the ass."  P.O Brodtman asked plaintiff to cover the desk for a moment and when plaintiff answered the phone, the caller said "The only pleasure you'll get up your ass here is a bullet." Plaintiff believes the caller was P.O. Edmonds.

46.     On February 25, 2001, plaintiff went to DIIT Training at the precinct.  On the desk where he took his test, there was writing about him being gay.

9

47.     On April 19, 2001, plaintiff found and copied one of the numerous signs in the precinct bathroom that read, "SCPD SOAPS (or dopes) - These are the Gays of Our Lives." There was another similar sign in the bathroom and officers, as well as Captain Ryan, talked about the sign and laughed at plaintiff.

48.     On May 21, 2001, plaintiff answered the phone at the precinct desk and police personnel stated "Weeks, I hear you give good head. Meet me after work and suck my cock, you fucking homo."

49.     On May 23, 2001, plaintiff sent a letter to Police Commissioner John Gallagher that stated "I request to have a private meeting with you in order to discuss sexual harassment/sexual discrimination in the workplace. I feel that I have been severely victimized over the past eighteen months." The letter outlined some of the improper treatment and noted that "the discrimination and unfair treatment has been severe enough that I have been considering resignation."

50.     On May 29, 2001, plaintiff received a memorandum from Sgt. George Hodge concerning his sick time.  Plaintiff was ordered to respond to Inspector Peter Quinn and in his response, he told Quinn that he was suffering because he was being abused.  Quinn did nothing to assuage the situation.

51.     On June 11, 2001, plaintiff was denied an assignment to a vacant car.  Plaintiff was informed that he did not get the position sought because Chief Robilotto wanted to make his life miserable.  Plaintiff was also told that he knew how tough the job was on minority people, insinuating that plaintiff was a minority because he was gay.

52.     On September 7, 2001, plaintiff observed additional offensive sex-based writings on walls about him and his sexual orientation.  Plaintiff later spoke to Sgt. Ensalata, who notified Inspector Quinn about the writings, but Quinn did not take any action.

53.     On October 16, 2001, plaintiff noticed additional signs, one of which stated "Weeks' fudge covered cock."

54.     During this time, IAB continued to harass plaintiff about his medical information.

55.     On January 8, 2002, plaintiff wrote a memorandum to Inspector Quinn, which complained about the harassment.  Among other things, plaintiff wrote "I have been extremely victimized by sexual harassment and sexual discrimination on this job for being bisexual."

56.     Thereafter, plaintiff began receiving memoranda on an almost daily basis requiring him to report to Inspector Quinn.  Furthermore, the offensive sexually explicit pictures, comments, signs and writings on the blackboards persisted and saturated the workplace, as did comments from department personnel. This behavior continued in a severe and pervasive manner to date.

11

57.    On January 10, 2002, plaintiff wrote a letter to Chief Deputy County Executive Eric A. Kopp, in which plaintiff specifically noted:

> "Since at least 1999, and continuing to date, I have been subject to sexual harassment and sexual discrimination in the workplace. I have reported the fact to numerous supervisors including the Police Commissioner. My reports have either been ignored or have not been taken seriously and the police department has failed to investigate or rectify the underlying problems raised by these reports. The sexual harassment and/or sexual discrimination has been received from different sources, including coworkers, immediate supervisors, and upper supervisors."

58.    In response to that letter, plaintiff was informed that Kelly Valentin-Brower, the Suffolk County Affirmative Action Officer, was assigned to investigate the matter.

59.    On January 13, 2003, plaintiff was again ordered to see Inspector Quinn who continued his harassing treatment of plaintiff.

60.    On January 21, 2002 Inspector Quinn ordered plaintiff to sign a document relating to plaintiff's accrued time under threat of being terminated. When plaintiff asked questions about the document, he was given a copy of a document with plaintiff's forged signature on it.

61.    On February 8, 2002, plaintiff once again sought assistance from his PBA representative, P.O. Edmonds. P.O. Edmonds refused to represent plaintiff and made it clear that he would not represent gay officers. Plaintiff was then told not to put P.O. Edmonds' name on any documents relating to him.

62.    On March 24, 2002, the depictions were abound in the 3rd Precinct.   One such depiction was of a male's head (depicting plaintiff) giving oral sex to a penis.  Plaintiff called the Suffolk County Executive's office to complain.

63.    Police Officer Edgley  began calling plaintiff "tubesteak" as an offensive reference to plaintiff's sexual orientation. Many coworkers began calling plaintiff "tubesteak" and harassing signs and writings began including same.  Plaintiff made it clear that he did not like the reference but the conduct continued.

64.    On April 2, 2002, in response to additional depictions, plaintiff complained to IAB and Suffolk County Affirmative Action Officer Kelly Valentin-Brower.

65.    On April 4, 2002, Inspector Quinn finally ordered that the blackboards be removed.

66.    On April 7, 2002, in black magic marker on the bathroom stall was written "Weeks will die like Matthew Sheppard."  Matthew Sheppard was a gay man who was severely beaten, tied to a fence and left to die. Plaintiff was frightened and reported the incident as a bias crime/death threat to Inspector Quinn.  Inspector Quinn eventually ordered the janitor to erase the writing without an appropriate investigation.

67.    On May 17, 2002, plaintiff filled out and filed an internal "Discrimination Complaint Form." Officers in the precinct somehow became aware of the form being filed.

13

68.    Plaintiff later discovered that officers had been throwing plaintiff's paperwork in the garbage instead of processing it properly. Many reports were discovered to be missing.

69.    On June 18, 2002, plaintiff filed a notice of claim.

70.    After filing the notice of claim, the harassment intensified. Plaintiff was informed that Quinn was "out to get him" and that Quinn was looking through his records to get him in trouble.

71.    On July 4, 2002, Plaintiff was harassed by Captain William Reede while Plaintiff was off-duty on Fire Island in a gay community. Captain Reede embarrassed Plaintiff in front of Plaintiff's friends by ordering Plaintiff over to him by name, and sarcastically stating "It figures I'd find you here with all these sick gay people." Sgt. Kirby accompanied Captain Reede. Both acted sickened by being surrounded by gay persons.

72.    Among other harassment, on August 16, 2002, plaintiff left his car to go to the bathroom. When he returned, on the hood of his car he found a black dildo with white spots that were supposed to represent semen, but that upon closer examination, appeared to be mayonnaise.

73.    In addition to the depictions and the offensive comments, seemingly phony 911 calls were dispatched to plaintiff, requiring him to respond to nude males running around and/or masturbating.

14

74.     On September 10, 2002, plaintiff noticed graffiti on the bathroom wall that stated "for the best head call Weeks." Plaintiff's real phone number was written on the wall under that statement.

75.     On September 18, 2002, after plaintiff responded to a fatal motor vehicle accident where he temporarily resuscitated a severely injured man, plaintiff reported to the precinct and observed another sign on the wall stating "The gay 321 operator," referring to plaintiff's assigned patrol vehicle.

76.     Efforts were again made by Chief Robilotto, Inspector Quinn, and Deputy Inspector Meehan to have plaintiff's weapons removed. On October 25, 2002, plaintiff was escorted to the Employee Relations Section ("ERS") as ordered so that ERS could evaluate him and decide whether or not they agreed that plaintiff's weapons should be removed. ERS did not agree and allowed plaintiff to leave with his weapons. Thereafter, plaintiff was ordered by Inspector Meehan to submit to drug and alcohol testing.

77.     On October 28, 2002, plaintiff was warned that Quinn was "on a rampage" and trying to "get" plaintiff. Later that day, somebody placed a condom, that appeared to be used, on plaintiff's police car. This occurred while plaintiff was on a call and he noticed that a police car had stopped near plaintiff's vehicle just prior to the discovery of the condom.

78.     On October 29, 2002, Quinn humiliated and embarrassed plaintiff by yelling at him while making him stand at attention in front of others.  After, when plaintiff went to the bathroom to gather himself, he found another harassing sign on the bathroom wall which stated  "Weeks gay bashing party ..."

79.     Plaintiff immediately spoke with Lt. Santamaria and reported that Quinn pushed him to his psychological threshold.  Plaintiff then requested time off - he was only granted time out on the condition that he took stress leave, requiring that his weapons be taken from him.  Plaintiff was harassed and intentionally embarrassed during this process.

80.     On November 2, 2002, plaintiff visited the precinct at night to deliver his paperwork. He noticed more offensive signs at that time.

81.     Plaintiff noticed that IAB officers were watching his house regularly and following him when he left his home.  Also, officers would drive by his home and shine the police light into his house.

82.     In addition to the above abuse, plaintiff was harassed in many other ways.  Such harassment, included, but is was not limited to:

        a.      Plaintiff was often removed from the car he was driving and assigned a less
                desirable car;

        b.      Plaintiff was not given time off when requested;

    c.       Plaintiff was denied the right to work overtime;

    d.       Plaintiff was not given various assignments;

    e.       Plaintiff was issued harassing memos and sometimes required to respond;

    f.       Plaintiff was disciplined for conduct which his similarly situated heterosexual co-workers were not disciplined for.

83.     It should also be noted that the occurrences set forth in this complaint do not include all the discriminatory harassment to which plaintiff was subjected, nor is every time plaintiff complained identified in this complaint.

84.     The aforementioned actions, practices and customs of the defendants herein have caused Plaintiff to suffer monetary losses in addition to great emotional and physical pain.

85.     The aforementioned actions of the defendants herein were intentional, willful, wanton, reckless, and malicious, giving rise to punitive damages as against the individual defendants.

## AS AND FOR A FIRST CAUSE OF ACTION
## AGAINST THE MUNICIPAL DEFENDANTS

86.     Plaintiff repeats, reiterates and realleges each and every allegation as set forth above with the same force and effect as if same were more fully set forth hereafter.

87.     By reason of the aforementioned actions, practices and customs of Defendants herein, Defendants have intentionally abridged and violated Plaintiff's federally protected constitutional rights secured by the First and Fourteenth Amendments to the Constitution of the

17

United States, as well as 42 U.S.C. §§ 1983, 1985 and 1988, including, but not limited to, his right to Equal Protection under the law.

88.     Municipal officials intentionally committed, condoned or were deliberately indifferent to the aforementioned violations of plaintiff's constitutional rights.  Such deliberate indifference may be inferred in the following ways:

> (A) Defendants had a custom or practice of harassing the plaintiff based on his sexual orientation and/or in retaliation for complaining about same (such complaints consist of oral complaints and/or written complaints and/or the filing of a notice of claim).  The discriminatory practices were so persistent and widespread that they constitute the constructive acquiescence of policymakers.

> (B) Supervisors failed to properly investigate and address allegations of discrimination, retaliation and/or harassment.

> (C) Inadequate training or supervision was so likely to result in the discrimination, retaliation, and/or harassment that policymakers can reasonably be said to have been deliberately indifferent to the need to provide better training and supervision to its employees.

### AS AND FOR A SECOND CAUSE OF ACTION
### AGAINST THE MUNICIPAL DEFENDANTS

89.     Plaintiff repeats, realleges and reiterates each and every allegation set forth above with the same force and effect as is more fully set forth hereafter.

90.     Defendants, by their intentional acts, denied Plaintiff his civil rights granted under the New York Human Rights Law § 290 *et seq.* of the Executive Law of the State of New York.

18

91.     The aforementioned acts of harassment and discrimination against Plaintiff were taken against plaintiff based on his sexual orientation, without just and reasonable cause and constitute an unlawful discriminatory practice relating to employment in violation of New York State Executive Law, Human Rights Law, § 290 *et seq.*

## AS AND FOR A FIRST CAUSE OF ACTION
## AGAINST THE INDIVIDUAL DEFENDANTS

92.     Defendant Gallagher permitted the aforementioned harassment and discrimination to perpetuate, without abatement, in violation of plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

93.     Defendant Robilotto unlawfully contributed to and permitted the aforementioned harassment and discrimination to perpetuate, without abatement, in violation of plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

94.     Defendant Quinn unlawfully participated in and permitted the aforementioned harassment and discrimination to perpetuate, without abatement, in violation of plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

95.     Defendant Meehan unlawfully participated in and permitted the aforementioned harassment and discrimination to perpetuate, without abatement, in violation of plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

96.     Defendant Ryan unlawfully permitted the aforementioned harassment and discrimination to perpetuate, without abatement, in violation of plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

97.     In addition to the aforementioned conduct, Ryan participated in that harassment by yelling at plaintiff, humiliating him and subjecting him to severe and/or pervasive harassment based, in part, upon his sexual orientation.

98.     Defendant Reede unlawfully permitted the aforementioned harassment and discrimination to perpetuate, without abatement, in violation of plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.  Reede engaged in other behavior in a severe and pervasive manner based on plaintiff's sexual orientation.

99.     Defendant Donahue unlawfully permitted the aforementioned harassment and discrimination to perpetuate, without abatement, in violation of plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

100.    Defendant Edmonds unlawfully participated in and permitted the aforementioned harassment and discrimination to perpetuate, without abatement, in violation of plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

101.   Defendant Edgley unlawfully participated in and permitted the aforementioned harassment and discrimination to perpetuate, without abatement, in violation of plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST THE INDIVIDUAL DEFENDANTS

102.   Plaintiff repeats, realleges and reiterates each and every allegation set forth above with the same force and effect as is more fully set forth hereafter.

103.   As more fully set forth above, the individual defendants aided, abeted, incited, compelled and/or coerced the aforementioned unlawful conduct in violation of New York State Executive Law, Human Rights Law, § 296(6).

## AS AND FOR A CAUSE OF ACTION AGAINST ALL DEFENDANTS

104.   The defendants and others were involved in a conspiracy with each other and other members of the SCPD for the purpose of harassing the plaintiff because of his sexual orientation.

105.   The conspiracy was motivated, in part, by a disliking or discriminatory attitude gay and/or bisexual men.  The conspiracy was in violation of 42 U.S.C. § 1985 and 1986.

21

WHEREFORE, Plaintiff demands judgment against Defendants in the sum of FIVE

MILLION ($5,000,000.00) DOLLARS as and for compensatory damages and FIVE MILLION

($5,000,000.00) DOLLARS as and for punitive damages based upon the abridgement of

Plaintiff's constitutional and civil rights. It is further requested that this Court grant injunctive

relief, reasonable attorney's fees and the costs and disbursements of this action as well as any

other relief to which plaintiff is entitled. Plaintiff demands a jury trial on the matters complained

of herein.

Dated: Carle Place, New York
          August 27, 2003

                              Respectfully submitted,

                              LEEDS MORELLI & BROWN, P.C.
                              Attorneys for Plaintiff
                              One Old Country Road, Suite 347
                              Carle Place, New York 11514
                              (516) 873-9550

                              By: _____
                                   RICK OSTROVE (RO-7248)

22